CHARLES ANDREWS, Administrator, Appellee, v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

86 677
126 240

1. **Negligence:** RAILROADS: DEFECTIVE TRACK: PERSONAL INJURY: INSTRUCTIONS TO JURY. Where in an action against a railroad company to recover damages for the death of the plaintiff's intestate, caused by the derailment of a train, alleged to be due to the neglect of the defendant to keep its track in proper repair, it appeared from the evidence that at the time of the accident ice from a stream which the road crossed at that point had become lodged upon or against the track, and that where the ice was after the accident the flanges of the rails were off, the bolt heads broken off, and the rails spread apart or bent, *held*, that the court properly left it to the jury to determine whether the accident was caused by the negligence of the defendant in failing to keep its track in repair, the jury having been instructed that under the pleadings and evidence the defendant could not be found negligent because of the ice on the track.

2. ———: ———: OPERATION OF TRAINS AT HIGH RATE OF SPEED. The accident in question occurred in the month of April, at about five o'clock in the morning, and after a hard rain, which had caused the stream which the road crossed at that point to rise, and the ice to float down over or against the defendant's track. Besides the bridge over said stream the defendant's road crossed a "dry bridge" about eight hundred feet to the east, and the accident occurred while the train was upon an embankment five or six feet high between said bridges. The character of the place was known to the engineer, and he had received notice of high water in a creek ten miles east of there. A passenger on the train testified that the speed of the train was such as to attract attention, and made him feel a little uneasy;

that the conductor showed signs of uneasiness, and about the time of the accident pulled the bell rope twice. The fireman on the train testified that at the time of the accident the train was moving at the rate of eighteen or twenty miles an hour; and there was evidence tending to show that a speed of six miles an hour would have avoided the accident. *Held*, that the evidence warranted the submission of the question to the jury, whether the defendant was negligent in running its train at too high a rate of speed.

3. ———: DAMAGES: LIFE TABLES AS EVIDENCE. The expectancy of life of the plaintiff's intestate being shown by the Carlisle life tables to be forty and three-fourths years, *held*, that an instruction, asked by defendant, that the deceased was liable to die at any time, that there was no certainty that he ever would have lived until he was twenty-one years old, and that they must not presume that he would be diligent in the acquisition of property, or successful in saving what he might acquire, while applicable to the case, and might well have been given, its refusal was not such error as to constitute a ground for reversing the case.

4. ———: ———: PRACTICE. The court having instructed the jury, in accordance with the contention of the defendant on the trial, that the measure of damage in such case is the loss or injury to the estate of the deceased, *held*, that the defendant could not be heard upon appeal to contend for a different rule of damage.

5. ———: MEASURE OF DAMAGES: INSTRUCTIONS TO THE JURY. The plaintiff's intestate was a boy, whose only business experience consisted in cutting, hauling and selling fifteen cords of wood for thirty dollars, but there being evidence as to the boy's health, character and intelligence, *held*, that the court was not in error in refusing to instruct the jury as to any specific method of calculation of damages to the intestate's estate, and properly left it to the jury to make the best estimate they could "of the loss in money" to said estate.

*Appeal from Chickasaw District Court.*—HON. L. O. HATCH, Judge.

TUESDAY, OCTOBER 25, 1892.

ACTION for personal injury resulting in the death of the plaintiff's intestate. Judgment for the plaintiff, and the defendant appeals.—*Affirmed.*

*John T. Fish* and *Noble & Updegraff*, for appellant.

*Spensley & McIlhon* and *J. R. Bane,* for appellee.

GRANGER, J.—On the night of April 4, 1888, a passenger train on the defendant's road was wrecked at a point west of New Hampton, in Chickasaw county, and the plaintiff's intestate was killed, and this action is to recover damages therefor. The accident occurred near the Middle Wapsie river, where the road passes along an embankment from five to seven feet high, and between two bridges that are some eight hundred feet apart; one of the bridges being across the Wapsie river, and the other known as the "dry bridge." The accident happened about five o'clock in the morning of the fifth of April. The following testimony from a witness for the plaintiff, who lived near the accident, will show something of the situation, and the facts will be important in connection with points to be considered. H. H. Reckers, for the plaintiff, testified:

"I know the bridge. I live on the Wapsie, three-fourths of a mile north of bridge, and five miles west of New Hampton. I was at home at the railroad accident there, April 5, 1888. It had been kind of thawing weather for a day or two. There was quite a good deal of snow on the ground. It had thawed up to a kind of slush, but was not thin enough to run yet. On the fourth of April it looked cloudy, and rained quite a lot,—considerable during the night. There was quite a little north wind in the morning. The rain turned the slushy snow to water, and made it run. The frost was not much out of the ground. The ice was in the creek the day before the wreck, and, the night before, it moved; that is, it rained, and where it had an escape it went out. In some places it stayed in the brush. It was a rainy, foggy night; as foggy as I have seen for a good many years. I went to the wreck between four and five o'clock. It had got a little light, but was still foggy, but not so much as in the night. I

approached wreck on east side. The water at north side was anyway halfway up on the stringers, and I think upon, if not over, the ties. I crossed dry bridge, and came to wreck. I just came to a spot where there was broken ties; and on the north side of track lay a large cake of ice. It was kind of slid upon the track, and the north end of it was braced down in the water. It was so close to north rail that one couldn't put his foot between the rail and the cake of ice. This ice laid, I should think, three or four car lengths east of the locomotive. It was east of sleeper, and between sleeper and bridge. If I remember right, where the ice was the south rail was entirely torn off for a ways. Right where the ice was the flanges of the rails were off. The bolt heads seem to have been cut off or broken off along the rails, and it just spread apart and bent the rails up. The ice was right between the sleeper and the first car,—that is, west of the sleeper. When I went there the dry bridge was bent over to the south four or five inches. There was ice lying against the bridge. I noticed the condition of the ties that had been disarranged by the wreck."

The allegations of negligence against the company are: *First,* in maintaining its road; and, *second,* in running its trains at too high a rate of speed.

I. The defendant asked the following instruction:

"12. The plaintiff has offered evidence bearing upon the condition of the ties in the roadbed at the place **1. NEGLIGENCE: railroads: defective track: personal injury: instructions to jury.** where the engine left the track. If you find that the engine came in contact with a large body of ice, and that such body of ice caused the derailment of the train, then you are to disregard all the evidence bearing upon the condition of the ties."

The instruction was refused, and the court gave the following:

"9. First, as to the alleged negligence of the

defendant in failing to keep its track in proper repair. It is claimed on the part of the plaintiff that the track was out of repair in consequence of defendant's neglect to remove decayed and unsound ties, and supply them with sound ones. It was the duty of the defendant to take due care to see that the ties in use are not permitted to decay to such an extent as to endanger the safety of its passengers, and an omission of this duty is a negligent failure to keep the road in proper repair. It is for you to say, in the light of the evidence, whether or not the defendant was guilty of negligence in regard to the ties at the accident in question."

The giving and refusal of these instructions are grounds of complaint. The ground of the appellant's contention in this respect is that the record fails to show a condition or state of the evidence to justify the court's instruction, it being the claim that it appears conclusively from the record that the cause of the accident was the body of ice on the track, because of which the accident occurred, and would have occurred independent of any condition of the ties; that sound ties would not have avoided the accident, nor changed the result as to the plaintiff's intestate. Of course, if the record sustains the claim, the instruction is erroneous, because then the condition of the road, other than as to the ice thereon, could not have caused the accident. But we cannot agree with the appellant's conclusion. It is very probable that the accident would not have occurred except for the ice, but that the ice would have caused the accident with any condition of the roadbed is so much a matter of doubt, under the evidence, as to make it a question for the jury. If, but for the rotten condition of the ties, the train would not have been derailed, then the accident was the result of a failure to properly maintain the road. The cake of ice and its situation as to the track are somewhat differently described by the witnesses, and its situation when

struck by the train was a question of fact, and of such doubt, under the evidence, that it was a proper matter for the jury to decide. It was not error for the court to give the instruction.

The court said to the jury that under the pleadings and the evidence it could not find the defendant negligent because of the ice on the track, and confined the inquiry to negligence in failing to keep the road at the place of the accident in proper repair, and in running its trains too rapidly. The court also said to the jury in its fourteenth instruction: "The burden is also on the plaintiff to prove by a preponderance of evidence that the negligence proven caused the death of the plaintiff's intestate." To recover, then, under the the instructions, the jury must find that the accident was a result of negligence in one of the two particulars stated. The court further said to the jury: "3. In order to recover anything in this action, the plaintiff must prove by a preponderance of evidence that the defendant, by its agents and employees, was guilty of the negligence aforesaid, or some part of such negligence, and that the negligence so proved caused the derailing of the train and the death of Willard Andrews." If the jury found that the ice was the sole cause of the derailment and injury, there could have been no recovery under the instructions given. While the instruction asked might have been given, we do not think there was error in the refusal.

It is said that the court erred in submitting to the jury the question of negligence as to the speed of the train, but we think not. The character of the place where the accident occurred was known to the engineer and he knew of the melting snow and storm with the heavy fog prevailing. He had been notified the same night by the engineer of the train going east of high water at Plumb creek, some ten miles east of the

2. ——: ——:
operation
of trains at
high rate
of speed.

place where the accident occurred, and there was much, to our minds, to indicate that there might be danger in approaching the Wapsie. A witness for the plaintiff who was a passenger on the train, testified that the rate of speed was such as to attract his attention, and made him feel a little uneasy; that it was down grade and the speed of the train was kept up until the train was derailed; and that "at the time of the derailment they were going faster than usual." He further testified: "I knew the conductor was uneasy, and felt, judging from his actions, considerable uneasiness about the rate of speed, or something that caused him to give two jerks to the bell rope. I was standing talking with him, on the next car to the sleeper, when he gave the the jerks. He reached up and gave the bell one pull. Then he made a short pause,—waited a little bit. Then he gave it another pull, and, just as he was pulling the other down, there came a sudden jar, and he let go his hold on the rope and took hold of a seat to brace himself, and I done the same. This might have been a minute or less before the accident. Another witness for the plaintiff, who was fireman on the train when the accident happened, testified that at the time of the accident the train was going about eighteen or twenty miles an hour. There is testimony tending to show that a speed of six miles an hour would have avoided the accident. Looking at the whole record, the question of whether or not the rate of speed was too high was one for the jury. To say the least, it is a question as to which ordinary minds might differ, and such a question is one of fact. *Whitsett v. Chicago, R. I. & P. R'y Co.*, 67 Iowa, 150.

III. The Carlisle tables were put in evidence as showing the expectancy of life of Willard Andrews, the person killed. Upon the question of the amount of recovery the defendant asked the following instruction:

3. ——: damages: life tables as evidence.

"14. The Carlisle tables have been offered in evidence, but you are not to regard such tables as proving that plaintiff is to recover for forty and three-fourths years of life. You are to bear in mind that Willard Andrews was liable to die at any time, and that there was no certainty that he ever would have lived until he was twenty-one years old. You are not to presume that he would be diligent in the acquisition of property, or successful in saving what he might acquire."

It was refused and the court gave the following:

"17. If you find for the plaintiff, you will assess the damages to which you believe him entitled. In doing so you will bear in mind that this action is not brought for the personal benefit of the father of Willard Andrews, but by the administrator of his estate, to recover in damages such sum of money as such estate has lost in consequence of his death. From the nature of the case, the law can give no rule by which this estimate can be accurately made, and the difficulty is increased by the fact that the deceased died so young, and before his business character was fully formed. The best that can be done is to consider the age of the boy at the time he died; the expectancy of of his life as shown by the Carlisle table; the physical character of the boy; his mental and moral character and attainments, so far as they affect the promise given by the boy, in a business point of view; the business in which his father was engaged; and the business character of the boy, in so far as such character was formed,—and, considering these things, make the best estimate you can of the loss in money suffered by his estate in consequence of his being taken off at so early an age by this accident."

It is insisted that the instruction refused was "especially applicable to the case." We think it was applicable and could well have been given; but is there

anything in the refusal upon which we can predicate a
finding of error? We must assume that the jurors were
possessed of that sense common to mankind. Any
person of ordinary intelligence knows that all persons
are liable to die at any time, and hence that they may
not attain to any particular age; and these facts, as to
Andrews, were known to this jury. The tables merely
gave the expectancy of life as fixed from statistical infor-
mation, but no one would understand that expectancy
of life meant certainty of life, nor that Andrews, if he
had not met his death as he did, would have been
exempt for a certain period from the ordinary chances
of death like other mortals. Nothing in the instruc-
tion given leads to a contrary view nor indicates that
more than the years of his actual life should be consid-
ered in the estimate of his accumulations. As to the
presumption that he would be diligent and saving, it
was certainly the duty of the jury not to presume
against such traits in the absence of proof. The
court told the jury to consider the business character
of the boy, in so far as such a character was formed,
in making its estimate, and such character would
include the traits of character as to diligence and econ-
omy.

IV. It is said that "the court erred in refusing to
set aside the verdict on the ground that there was no
evidence of pecuniary injury, and on the
ground that the damages given were
excessive, and in giving the seventeenth instruction of
the court." The contention is largely based on the
rule of damages under our statute where the beneficiary
of the suit is known, and is the father, as in this case.
It is said in argument: "Now, what is the measure of
damages? Shall it be the present value of all probable
future accumulations, or the present value of whatever
pecuniary advantage might reasonably be expected
to inure to the father in his lifetime through his son if

<span style="margin-left:2em">4. ——: ——:<br>practice.</span>

he had lived?" The proposition, in brief, is, is the rule of damage the injury to the estate or to the next of kin? And the claim is, that it is the latter. The question has been repeatedly noticed by this court, but need not be again at this time. The rule now contended for is not the one asked on the trial. The defendant then asked the court to give, as the measure of damage, if the plaintiff was entitled to recover, the damage to the estate of Willard Andrews. It was such a rule that the court gave, though in different language. Under such a state of the record, the defendant cannot complain. *Smith v. Sioux City & Pac. R'y Co.*, 38 Iowa, 173; *Weller v. Hawes*, 49 Iowa, 45; *Campbell v. Ormsby*, 65 Iowa, 518.

The claim as to excessive damage is based on the difference allowable under the different rules; that of actual damage to the next of kin being less than the damage to the estate. Under the rule given the amount allowed could not well be thought excessive.

V. It is next urged that there is error in the rule of the court fixing the measure of damage (instruction seventeen, before given), because it does not authorize an abatement of interest from the probable amount of accumulations during the expectancy of life as shown by the evidence. Instructions, varying in form, were asked by the defendant, quite specific as to the method for fixing the present value of such an estate, as by fixing the amount of the earnings during the period of expectancy, and then, by an abatement of interest, give the present worth of that sum. The condition of the evidence made it very difficult for the jury to adopt any such specific method of calculation because of the youth and inexperience of the boy, and a lack of *data* from which to calculate his future earnings. It is said by the appellant that his entire business experience consisted in cutting, hauling, and selling fifteen cords

5. —: measure of damages: instructions to the jury.

of his father's wood for thirty dollars.    But because of this meagerness of *data* from which to estimate, it can not be said that there is no damage that can be assessed. We know there is damage in such a case, in all reasonable probability, and the estimate must be made, though uncertain, as best it can.    In such cases it is left to the sound discretion of the jury to fix, in the light of the information it has, the probable amount of damage, reserving at all times the authority of the court to guard against manifest injustice by way of excessive estimates.    The jury had, from the evidence, some information as to the character, intelligence, and health of the boy.    In the light of information common to all men, and available to guide the jury, it could, with the same certainty that supports many judgments in our courts of justice, say how much the estate of the deceased was probably damaged.    Under such a record as to *data* we are not prepared to say that a failure to prescribe some formal method of deliberation or calculation was error, nor is there anything in the record or result to indicate that the verdict is not the present worth of the estate.    The court, after specifying some matters for consideration, said to the jury:    "Considering these things, make the best estimate you can of the loss in money suffered by the estate."    That would be the loss at the present time, and, in the absence of *data* from which the court could give more definite instructions, we think there are no just grounds of complaint.    It is urged that in *Coates v. Burlington, C. R. & N. R'y Co.*, 62 Iowa, 486, this court held an instruction "very like the seventeenth given    *    *    * in the case at bar" as too general and indefinite. There is a clear distinction between the instructions in the two cases.

We think the judgment should be AFFIRMED.